FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 2 4 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| WESTGATE FINANCIAL CORPORATION, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| COTSWOLD INDUSTRIES, INC.; COTSWOLD NON-WOVEN RETAIL, LLC; EXPERT STITCH, LLC; HTCW, INC.; and JEREMY A. MOULTON, | ) ) ) ) ) |
| Defendants. | ) ) ) |

WSD

Civil Action
File No.: **1 09-CV-2627**

## COMPLAINT

### Preliminary Statement

1.    Plaintiff Westgate Financial Corporation ("Westgate") brings this action against Defendants Cotswold Industries, Inc. ("Cotswold"); Cotswold Non-Woven Retail, LLC ("Cotswold Non-Woven"); Expert Stitch, LLC ("Expert Stitch"); HTCW, Inc. ("HTCW"); and Jeremy A. Moulton, alleging tort claims arising from, but not limited to, a civil conspiracy among the Defendants to hinder, delay and prevent Westgate's collecting all amounts owed to Westgate by HTCW and to convert HTCW property in which Westgate had a secured interest to themselves,

and to interfere, without privilege, in Westgate's relationship with HTCW and in it property rights, in violation of Georgia law.

2.    As alleged in a separate but related action, Westgate Financial Corp. v. HTCW, Inc., File No. 1:09-CV-1069-WSD (the "Related Action"), HTCW knowingly presented and sold customer accounts receivable to Westgate that HTCW represented to Westgate were bona fide and existing obligations of HTCW's customers arising out of the sale of product.  HTCW and its employees Brenda Liston and Belinda Quinones knew those representations were false and fraudulent at the time they were made inasmuch as Liston and Quinones have admitted HTCW had never shipped the goods or product to any such customers as represented in the invoices.  In addition to these multiple acts of fraud, HTCW breached its obligations under the parties' factoring agreement and security agreement, and Liston breached her obligations under her separate guaranty agreement.  Westgate is pursuing those claims against Liston and HTCW in the Related Action, but as of the date of filing this Complaint, that action is stayed against Liston because of Liston's filing of a Petition under Chapter 7 of the Bankruptcy Act, Case No. 09-84101 in the Bankruptcy Court for the Northern District of Georgia.

2

3.    This case seeks to recover against Cotswold and the other Defendants because they actively engaged in fraud and efforts to cover up fraud, designed to prevent Westgate from timely accessing the collateral in which Westgate had a secured interest, and from collecting what it is owed from HTCW. Defendant Cotswold, i n particular, devised a scheme to avoid or to hinder and to delay Westgate's rights to collection of the obligations due and owing to it by HTCW. Ultimately, Cotswold, because of its actions, stands in the shoes of HTCW as HTCW's successor and is subject to successor liability.

4.    As part of this scheme, or in addition to it, HTCW also fraudulently transferred portions of HTCW's inventory in which Westgate held a valid and enforceable security interest to Defendant Expert Stitch and/or other non-parties. Expert Stitch then sold those items in violation of Westgate's security interest therein. This contravened Westgate's written instructions regarding the inventory provided to HTCW and Defendant Moulton, demanding surrender of the inventory, and prohibiting the Defendants from disposing of that inventory. Cotswold was aware of and enabled these activities, and upon information and belief paid Expert Stitch's operating expenses and payroll, as well as monies to Liston directly, to allow this activity to continue.

5.      All of the Defendants took part in these and, upon information and belief, other as-of-yet unknown acts with the intent to interfere with Westgate's rights to the assets and to hinder and delay Westgate in enforcing its rights therein until such time as the value of those assets was either wasted or transferred to either Cotswold or Cotswold Non-Woven, or other non-parties.

6.      Cotswold, Cotswold Non-Woven, and/or Expert Stitch, is liable for these acts either as the successor to HTCW or, in the alternative, on the grounds of a civil conspiracy designed to prevent Westgate from collecting what it is owed from HTCW or pursuant to the Uniform Fraudulent Transfer Act, O.C.G.A. § 18-2-77 ("UFTA") or for interference with Westgate's rights as a creditor and, specifically, the secured creditor of HTCW or as a result of their, and each of their tortious interference with Westgate's contracted relationship with HTCW.

7.      Additionally, Moulton participated in the conspiracy with some or all of the other named Defendants to avoid Westgate's rights and took overt steps in furtherance of the conspiracy, assisted HTCW in fraudulently transferring certain HTCW assets to Expert Stitch, and assisted in transferring HTCW's assets and rights to Cotswold and/or the Cotswold Non-Woven, and otherwise took steps in his capacity as counsel to one or more of the other named Defendants to frustrate,

4

hinder or delay Westgate in the enforcement and collection of the obligations owing from HTCW to Westgate.

Accordingly, to set forth its claims and seek relief in accordance with the Federal Rules of Civil Procedure and applicable law, Westgate alleges as follows:

## **Parties**

8.     Westgate is a New Jersey corporation with its principal place of business in Hoboken, New Jersey.

9.     Cotswold is a New York corporation with its principal place of business in New York. Cotswold is registered to do business in Georgia, and its registered agent is listed as Douglas P. Krevolin at Krevolin & Horst, 1175 Peachtree Street, NE, Suite 2150, 100 Colony Square, Atlanta, GA 30361. Cotswold is subject to the personal jurisdiction of this Court.

10.     Cotswold Non-Woven is a Georgia limited liability company with its principal place of business in Georgia. Cotswold Non-Woven's registered agent is listed as Douglas P. Krevolin at Krevolin & Horst, 1175 Peachtree Street, NE, Suite 2150, 100 Colony Square, Atlanta, GA 30361. Cotswold Non-Woven is subject to the personal jurisdiction of this Court.

11.     Expert Stitch, LLC, is a Georgia limited liability company which until on or about July 30, 2009, shared its principal place of business with HTCW. Expert

Stitch's current principal place of business remains in Georgia. Moulton is Expert Stitch's registered agent and Expert Stitch may be served through him. Expert Stitch is subject to the personal jurisdiction of this Court.

12.    Expert Stitch is solely owned and operated by Brenda Liston. Liston also was and is the sole shareholder of HTCW, with sole right to direct the operations of HTCW.

13.    HTCW is a Georgia corporation with its principal place of business in Georgia. HTCW may be served with process by and through its registered agent for service, Jeremy A. Moulton, LLC, at 925 Railroad Street, Conyers, GA 30012. HTCW is subject to the personal jurisdiction of this Court.

14.    Moulton has been counsel to Brenda Liston, HTCW, and Expert Stitch, and is a resident of this district and subject to the personal jurisdiction of this Court.

### Jurisdiction and Venue

15.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332, in that it is a civil action wherein the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.    Venue is proper in this Court under 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

### Factual Allegations

### A.    HTCW Enters into Agreements with Westgate to Factor HTCW's Accounts Receivable.

17.    On or about August 4, 2008, Westgate and HTCW entered into a "Factoring Agreement" (the "Factoring Agreement").  In that Factoring Agreement, HTCW agreed to sell to Westgate, and Westgate agreed to purchase from HTCW, all of HTCW's present and future accounts, contract rights and other forms of obligations for the payment of money arising out of the sale by HTCW of goods or the rendition of services acceptable to Westgate.  Paragraph 8 of the Factoring Agreement contains a security agreement granting Westgate a security interest in "all of [HTCW's] assets," including but not limited to the enumerated examples set forth therein such as accounts receivable, machinery, inventory, property, trademarks, trade names, and contract rights.

18.    A true and correct copy of the Factoring Agreement is attached hereto as Exhibit A and incorporated herein.

19.    In practice, HTCW invoiced its customers for goods shipped; sold and assigned the account receivable to Westgate for payment; and Westgate advanced

7

monies to HTCW against the purchase price of the account receivable. Thereafter, on accounts receivable that were not disputed by the customer, Westgate would credit HTCW's account with the balance of the payment for the account receivable on the Payment Date as defined in the Factoring Agreement.

20.    In the Factoring Agreement, HTCW warranted that all of the invoices "are, and at the time of assignment [will be] bona fide and existing obligations of our customers arising out of the sale of goods and/or rendition of services in the ordinary course of business . . . ."

21.    In the Factoring Agreement, HTCW agreed that "[i]n the event of any breach by us of any provision, or upon a default . . . or upon termination of this Agreement, we will pay all Obligations upon demand."

**B.    HTCW Sends Westgate Fraudulent Invoices.**

22.    Beginning in the fall of 2008 and continuing into February 2009, HTCW sold customer accounts receivable to Westgate which HTCW represented to Westgate were bona fide and existing obligations of HTCW's customers arising out of the sale of goods by HTCW and were due and payable according to their terms without dispute, offset, or deduction.

23.    On or about February 22, 2009, and February 23, 2009, Westgate sent one of its employees, Joseph Cella, to HTCW to review HTCW's books and records.

8

24.    During the review, Cella performed a shipping test on seventeen (17) invoices to determine whether the invoices were for goods actually shipped to customers.

25.    Cella was unable to locate 13 of the shipping documents to validate the invoices.  When he asked an HTCW employee, Belinda Quinones, for assistance, she found only one shipping document to validate the invoice.  Quinones then researched the issue and determined that the other 12 invoices did not have accompanying shipping documents because HTCW never shipped the goods reflected in the invoices and the goods were still in the HTCW warehouse.

26.    Because of the large volume of invoices without corresponding proofs of shipment, Cella was unable to verify if each invoice was for goods actually shipped to a customer.

27.    Upon Cella's return to New Jersey, Bruce Cohen, President of Westgate, contacted Liston who advised Bruce Cohen that the problem was because of errors in electronic data transmission of the invoices to one of its customers, and that she would straighten out the errors.

28.    To complete its field audit and validation of the invoices, Westgate informed HTCW that it would return to Atlanta with two people on March 2, 2009, to assist

9

HTCW in clarifying the electronic data transmission errors and to tie out the invoicing discrepancies.

29.    HTCW agreed to the supplemental review on February 26, 2009.

30.    On February 27, 2009, Quinones called Westgate at about 4:45 p.m. and told Westgate not to return to HTCW and to send all future communications to Moulton as HTCW's counsel.

31.    Also on February 27, 2009, Moulton, on behalf of HTCW, sent a letter to Westgate purporting to terminate the Factoring Agreement ("Termination Letter") immediately.

32.    A true and correct copy of the Termination Letter is attached hereto as Exhibit B.

### C.    Cotswold Interfered In The Westgate-HTCW Relationship.

33.    In or around late December 2008, James McKinnon of Cotswold Industries, Inc. contacted HTCW's Brenda Liston about Cotswold's potentially purchasing all or part of HTCW's business.

34.    On or about January 5, 2009, James McKinnon visited HTCW's facility at 3530 N. Henry Blvd., Suite B, Stockbridge, GA  30281.

35.    A few days later, upon information and belief, James McKinnon and Moulton discussed how Cotswold might be able to purchase HTCW given Westgate's security interest.  The parties also discussed terminating the HTCW – Westgate agreement.  On or about January 7, 2009, following those communications, Moulton advised James McKinnon that he believed the Factoring Agreement between HTCW and Westgate was terminable upon sixty days' notice.

36.    The next day, on January 8, 2009, James McKinnon inquired of Liston and Moulton whether Cotswold could license the HTCW name and product codes. Moulton responded that Liston would prefer to license the HTCW name and product codes to a new entity to be formed jointly and owned by Cotswold and Liston.  McKinnon rejected the proposal, but reiterated an interest in licensing the products and styles associated with the HTCW name and with the name itself.  In particular, Cotswold was interested in assuming a very valuable customer relationship HTCW had with a major retailer, Wal-Mart.

37.    In or around the middle of January 2009, Liston traveled to New York to meet with Cotswold executives including James McKinnon, his father Wink McKinnon, and his uncle Jim McKinnon.  Upon information and belief, the Cotswold executives and Liston discussed Cotswold's taking over HTCW.  In particular, they discussed taking over HTCW in such a way so as to avoid

Westgate's security interest in HTCW's assets under the Factoring Agreement, which in addition to accounts receivable, inventory, machinery and equipment also covered the very name, product codes and customer relationships that Cotswold was interested in acquiring. Cotswold and Liston also met with a representative of Wal-Mart to discuss Cotswold's taking over HTCW's business.

38.    Upon information and belief, at the same January meeting, as well as subsequent thereto, Cotswold and Liston also discussed using another entity controlled by Liston, Expert Stitch, to takeover HTCW's business and provide Cotswold with a retail outlet for non-woven goods like those sold by HTCW. That topic was again raised and suggested by Moulton in mid-February to avoid what Moulton considered to be "the Westgate problem."

39.    Based on discussions between Liston and Cotswold, on or about January 23, 2009, while the attorney for HTCW, for Expert Stitch, and for Liston, Moulton prepared a draft distributorship agreement between Expert Stitch and Cotswold. Upon information and belief, the purpose of the proposed distributorship agreement was to use Expert Stitch as a means to takeover HTCW's name and business and avoid Westgate's security interest in HTCW's name, inventory, machinery and equipment, as well as other assets. In particular, the entire

agreement depended on Expert Stitch being able to "license the intellectual property and certain machinery from HTCW, Inc."

40.    A true and correct copy of the proposed "rough draft" of the Distributorship Agreement is attached hereto as Exhibit C.

41.    Throughout this period of time, HTCW continued to sell and assign fraudulent receivables to Westgate, and to obtain a portion of the purchase price for same, all with full knowledge that payment would not be made on these invoices.

42.    Although the parties did not enter into the Distributorship Agreement, they continued to negotiate alternatives for Cotswold to take over the HTCW business. Their negotiations included discussions of Cotswold's paying Liston individually a lump sum of money, a share of the profits, and providing her with some period of guaranteed employment with Cotswold rather than making a direct payment to HTCW for its assets.  Moulton was involved in these negotiations and in drafting documents intended to embody the parties' agreement.

43.    In this time frame between January and February, Cotswold engaged in substantial due diligence regarding HTCW's business including inquiring about customers, revenue, and reviewing financial documentation of HTCW.

44.   For several years previously and continuing through this time, Cotswold was doing business with HTCW.  In particular, Cotswold sold goods to HTCW.

45.   On or about January 29, 2009, Cotswold sent a proposed letter of intent to acquire HTCW's assets, including but not limited to "the name, the customer accounts, the A/R, and the machinery" ("Letter of Intent").  The proposed Letter of Intent was conditioned specifically upon the successful buyout of Westgate's interest in HTCW.

46.   A true and correct copy of the Letter of Intent is attached hereto as Exhibit D.

47.   The parties continued to negotiate the specifics of Cotswold's acquisition of HTCW's assets and exchanged additional proposals.  At least during the January 2009 timeframe, Cotswold continued to make its acquisition of HTCW's assets contingent upon its successful buyout of Westgate's interest in HTCW.

48.   In or around February 2009, Cotswold approached Westgate by telephone and proposed a buyout of Westgate's interest in HTCW.  Jim McKinnon expressed Cotswold's interest in purchasing Westgate's interest at a discount or "haircut."  When Bruce Cohen queried why Westgate should take a haircut when Westgate owned over $1,000,000.00 in HTCW accounts receivable against advances, and other charges of approximately $500,000.00, and there should be more than

14

sufficient collections to payment in full, Jim McKinnon inquired of Cohen whether or not he was sure that the invoices were good and the conversation ended.

49.    When Westgate refused Cotswold's offer, James McKinnon changed strategies, plotting to have Westgate's relationship with HTCW terminated. (See e-mail exchange between James McKinnon to Wink McKinnon & Jim McKinnon dated February 12, 2009 (attached hereto as Ex. E).)   James McKinnon wrote: "Let's say she fires Westgate and THEN we acquire HTCW.  We start billing and drawing 85%.  We would have to fund the purchasing and manufacturing through the 85% until we collected from Westgate . . . ."

50.    Wink McKinnon responded with the suggestion that Liston simply force HTCW out of business and that Liston then transfer HTCW's business from HTCW's customers to Cotswold.  (See id. (Ex. E).)  Upon information and belief, Wink McKinnon's proposal was intended to find a way for HTCW and Cotswold to avoid HTCW's Factoring Agreement with Westgate and payment of its obligations to Westgate.

51.    Upon information and belief, on or about February 17, 2009, Cotswold issued a press release announcing that it and HTCW "have entered into a fulfillment agreement as of February 17, 2009.  Cotswold will be fulfilling certain

15

HTCW orders on a temporary basis . . . ."  At this time, HTCW was still assigning invoices to Westgate.

52.    Cotswold, HTCW and Moulton, however, only planned to keep HTCW as a viable entity until such time as Cotswold could take over HTCW's ongoing business and other assets.

53.    Shortly after Westgate declined to let Cotswold buy Westgate out at a discounted value Moulton, on behalf of HTCW, attempted to terminate the Factoring Agreement by disingenuously alleging an unarticulated breach of the Factoring Agreement by Westgate.  No prior demands regarding an alleged breach had been made.

54.    Notwithstanding the fact that Moulton was the attorney for HTCW, Moulton continued to negotiate on Liston's behalf agreements with Cotswold for it to obtain HTCW's assets by making payments to Liston for her benefit and without payment to HTCW.    Payment to HTCW would have benefitted creditors, including Westgate, instead of benefitting Liston.

55.    At all relevant times, Westgate was a secured creditor of HTCW.

56.    As of March 2, 2009, Moulton told James McKinnon that "we are prepared to sign and transfer orders now.  I think it best to leave Westgate out of the loop as they are angry with the termination and will only seek to undermine the deal."

57.     On or about March 5, 2009, Cotswold and Liston entered into a final employment agreement for Liston to join Cotswold ("Employment Agreement").

58.     A true and correct copy of the Employment Agreement is attached hereto as Exhibit F.

59.     In the Employment Agreement, Cotswold and Liston agreed that she would:

    a.      "cause HTCW to assign its product codes . . . to Cotswold."

    b.      "cause HTCW to assign all pending orders to HTCW to Cotswold for fulfillment, and shall notify customers of the assignment.  Customers shall be notified to make payment for all goods shipped by Cotswold to Cotswold . . . ."

    c.      "make all good faith efforts to license the use of the HTCW, Inc./Expert Stitch, LLC machinery for purposes of converting Cotswold goods, as needed;" and

    d.      continue to "work out of former HTCW offices."

60.     In the Employment Agreement, Cotswold and Liston agreed that Cotswold would pay Liston's reasonable business expenses, "including HTCW's reasonable overhead, including rent and payroll necessary for converting goods, if necessary" and that Liston would be eligible for "5 weeks paid personal leave/vacation" and "all fringe benefits available to Cotswold executives . . . ."

61.    In the Employment Agreement, Cotswold also agreed to pay Moulton $3,000.00 for attorneys' fees as counsel for HTCW and Liston.

62.    Cotswold provided that Liston would receive profit sharing and "25% of the profits the division generates (after all expenses for HTCW division.)"

63.    As part of the employment arrangement, Cotswold also required Liston to indemnify it "against liability resulting from HTCW's financial relationship with Westgate Financial including their factoring agreement." (Indemnity Agreement dated Mar. 5, 2009 (attached hereto as Ex. G).)

64.    Upon information and belief, on or before March 5, 2009, Cotswold began conducting HTCW business as HTCW Retail, a division of Cotswold Industries.

65.    Cotswold used the name "HTCW" in the marketplace. But, when they received "a little flack from a few vendors about the htcw name [it is] using," David Chistov, an employee of Cotswold, decided to change the name to "retail division." (ECOS 001082, e-mail from D. Chistov to James W. McKinnon dated Mar. 11, 2009 (attached hereto as Ex. H).

66.    The parties structured the transaction so that Cotswold could use and trade upon the HTCW name and goodwill, as well as use the HTCW customer list, styles, and product codes without having to pay HTCW for it. For example, prior to or as soon as HTCW attempted to terminate the Factoring Agreement, Cotswold

took over HTCW's business and began operating its business as "HTCW Retail" and thereafter "HTC Retail."

67.    Cotswold also continued HTCW business through Expert Stitch.    For example, Cotswold paid former HTCW employees through Expert Stitch.

68.    Prior to taking over HTCW, Cotswold only sold to manufacturers and distributors and not to the retail industry (i.e. not to retail stores such as Wal-Mart and Joanne's).

69.    On March 18, 2009, Cotswold formed Cotswold Non-Woven Retail, LLC.

70.    Cotswold formed Cotswold Non-Woven for the purpose of shielding Cotswold as best as Cotswold could from the claims of creditors of HTCW, such as Westgate, while also taking advantage of the HTCW name and bar codes.

71.    Cotswold decided to form Cotswold Non-Woven as a single-member limited liability company to attempt to insulate Cotswold from any liability relating to HTCW.

72.    Cotswold then wanted to shift its arrangement with Liston (the Employment Agreement and Indemnity Agreement) to Cotswold Non-Woven.

73.    True and correct copies of the proposed new agreements between Cotswold Non-Woven and Liston are attached hereto collectively as Exhibit I.

78.    The concept Cotswold had in early March 2009 was that once HTCW ceased to exist, Cotswold could use its new division to fulfill customers' orders on HTCW's old styles.

79.    One of the officers of Cotswold clearly understood the potential problem with Cotswold's approach to taking HTCW's name when he wrote:

> . . . "HTCW"'s name, which has a lien against it, can be abandoned like a sofa on the sidewalk.  Then picked up by another party in this case [Cotswold Non-Woven]??

(E-mail from Malcolm McKinnon to Jim McKinnon dated Mar. 18, 2009 (attached hereto as Ex. J).)

80.    Cotswold continued to struggle with its continued use of the HTCW name because of various legal issues with vendors and creditors of HTCW.  To avoid HTCW's creditors, Cotswold came up with a contingency plan of using the name "HTC Retail" to avoid the legal liabilities of using the HTCW name.

81.    Nevertheless, despite the struggles with the use of the name, the parties continued to do business as HTCW for some period of time.

82.    Cotswold also continued the business, paying the HTCW employees or "former" employees.

21

83.    On March 31, 2009, Cotswold Non-Woven filed the trade name application in the Superior Court of Muscogee County, Georgia, to use the name "HTC Retail."

84.    In May 2009, given the continuity of the business and HTCW's debts to it, Westgate contacted Cotswold in an attempt to understand Cotswold's interest in HTCW.  Cotswold did not respond.

### D.    The Expert Stitch Pass-Off

85.    Westgate had a properly perfected security interest in all of HTCW's assets ("Westgate Inventory") per its filed U.C.C. statement, a true and correct copy of which is attached hereto as Exhibit M.

86.    HTCW, in an effort to prevent Westgate from benefitting from its secured interest, transferred items from the Westgate Inventory to Expert Stitch without HTCW's receiving a reasonably equivalent value in exchange.

87.    HTCW transferred inventory to Expert Stitch with the actual intent to defraud, hinder, and/or delay Westgate's exercise of its rights in the Westgate Inventory.

88.    At the time that Liston made the transfer(s), she controlled both HTCW and Expert Stitch and Moulton represented both HTCW and Expert Stitch.  Moulton was aware of the transfers.

22

89.    A copy of the Expert Stitch web page offering HTCW Products for sale at clearance prices is attached hereto as Exhibit K.

90.    Upon information and belief, Liston did not keep separate books and records for HTCW and Expert Stitch, but regularly mingled assets between the two. According to Moulton, "Expert Stitch acquired what little it sold mostly from scraps left over from HTCW, which would otherwise have been discarded. The two companies did account between one another for any transfers of material, or overlap of payroll, but there were 'no checks, wire transfers, EFT transfers,' nor were invoices or purchase orders . . . ." (Ltr. from J. Moulton to E. Birg dated September 2, 2009 (attached as Ex. L).)

91.    Yet, in the period between March 2008 through March 2009, HTCW transferred a net of over $73,000 (by check) from HTCW to Expert Stitch.

92.    Expert Stitch did not repay those funds to HTCW, thereby converting those funds to its own use or Cotswold's or Moulton's use.

93.    Expert Stitch advertised for sale and sold Westgate Inventory. Expert Stitch did not turn over any of the money received for sale of the Westgate Inventory to Westgate, thereby converting those funds to its use or Cotswold's use.

**E.   Cotswold's Use of Expert Stitch to Continue the HTCW Business.**

94.   Since Liston and Cotswold caused HTCW to discontinue business, Expert Stitch has been operating the HTCW business.

95.   Moulton indicated in his September 2 letter that there were "payments made by Cotswold to Expert Stitch to cover various expenses as described in the contract between HTCW and Cotswold, which you already have." (Id.) Moulton clearly meant that the Employment Agreement was the contract between HTCW and Cotswold. Moulton indicated that all of the funds paid from Cotswold to Expert Stitch were paid by wire.

96.   Cotswold pays all of Expert Stitch's expenses including payroll, supplies, and utilities.

97.   Cotswold regularly pays Liston and Quinones as direct employees of Cotswold.

**COUNT ONE**

**VIOLATION OF THE UFTA OR, IN THE ALTERNATIVE, CONVERSION BY HTCW, COTSWOLD AND/OR COTSWOLD NON-WOVEN**

98.   Paragraphs 1 through 97 of this First Amended Complaint are incorporated by reference into this Count as if fully restated herein.

99.    In or around early 2009, HTCW became or was insolvent, and Cotswold and/or Cotswold Non-Woven and Liston knew HTCW was insolvent.

100.  Cotswold and/or Cotswold Non-Woven obtained the HTCW name without any value being provided to HTCW in exchange.

101.  Cotswold and/or Cotswold Non-Woven obtained HTC's customer list and customer relationships among other items (including perhaps inventory), as may be proven at trial, without any value being provided to HTCW in exchange.

102.  Upon information and belief, Cotswold and/or Cotswold Non-Woven obtained other assets of HTCW's, including items from the Westgate Inventory, without any value being provided to HTCW in exchange.

103.  The transfer of HTCW assets (including but not limited to the name and customer list) to Cotswold and/or Cotswold Non-Woven was with the actual intent to hinder or delay Westgate's ability to exercise its rights in those assets as a result of its perfected security interest.

104.  Cotswold and/or Cotswold Non-Woven took tangible and/or intangible assets belonging to HTCW and in which Westgate had an interest and converted them to their own use.

105.  Cotswold's actions were designed to avoid creditors of HTCW in addition to Westgate.   For example, in an answer to a garnishment proceeding in Fulton

County, Georgia, Cotswold boldly and falsely claimed, "It has not done business with defendant [HTCW] . . . [and does not] have any of defendant's property in its possession." Such a statement was designed to thwart HTCW creditors like Westgate. (See Ex. N hereto.)

106. As a result of the acts described in this Count, Westgate has been damaged and HTCW, Cotswold and/or Cotswold Non-Woven are liable to Westgate for those damages in an amount to be determined at trial.

107. As a result of the acts described in this Count, under the UFTA, Westgate is entitled to relief, including but not limited to:

     a.    avoidance of any transfer of assets from HTCW to Cotswold and/or Cotswold Non-Woven;

     b.    attachment of any HTCW assets in Cotswold's and/or Cotswold Non-Woven's possession, custody, or control;

     c.    an injunction to prevent further conversion or transfer of HTCW's assets;

     d.    a constructive trust on all proceeds (and payment to Westgate thereof);

     e.    compensatory damages against HTCW, Cotswold and/or Cotswold Non-Woven;

f.    punitive damages; and

g.    any other relief that may be just and proper under the UFTA.

## COUNT TWO

### CIVIL CONSPIRACY TO VIOLATE THE UFTA AND/OR TO COMMIT THE TORT OF CONVERSION BY MOULTON, EXPERT STITCH, COTSWOLD AND/OR COTSWOLD NON-WOVEN

108.   Paragraphs 1 through 107 of this First Amended Complaint are incorporated by reference into this Count as if fully restated herein.

109.   Moulton, Expert Stitch, Cotswold and/or Cotswold Non-Woven, acting in concert, conspired to deprive Westgate of its property interests by transferring HTCW assets, including but not limited to its name, valuable customer and bar codes, and customer lists and other items of the Westgate Inventory, to Cotswold and/or Cotswold Non-Woven.

110.   As a result of their activities as described above, including but not limited to their extensive efforts to continue HTCW's business while thwarting HTCW's creditors, Westgate was damaged in an amount to be determined at trial, and Moulton, Expert Stitch, Cotswold, and Cotswold Non-Woven are liable to Westgate for that amount.

## COUNT THREE

### VIOLATION OF THE UFTA OR, IN THE ALTERNATIVE, CONVERSION, BY HTCW AND EXPERT STITCH

111. Paragraphs 1 through 1110 of this First Amended Complaint are incorporated by reference into this Count as if fully restated herein.

112. In or around early 2009, HTCW became or was insolvent, and Liston and Expert Stitch knew HTCW was insolvent.

113. HTCW and Expert Stitch simultaneously, either (a) caused HTCW Goods (as defined above) to be transferred to Expert Stitch without Expert Stitch paying for them, or (b) caused Expert Stitch to sell HTCW goods to non-parties without remitting the value received in sales of those goods to HTCW, and (c) transferred HTCW money from its account to Expert Stitch's account.

114. Expert Stitch sold the HTCW Goods with the actual intent to hinder or delay Westgate's ability to exercise its rights to the goods as a result of its perfected security interest.

115. HTCW transferred funds to Expert Stitch with the actual intent to hinder or delay Westgate's ability to exercise its rights to the goods as a result of its perfected security interest.

116. Expert Stitch took goods and money in which Westgate had an interest and converted them to its own use.

28

117. As a result of Expert Stitch's acts, Westgate has been damaged and HTCW and/or Expert Stitch are liable to Westgate for those damages in an amount to be determined at trial.

118. As a result of HTCW's and/or Expert Stitch's acts, under the UFTA, Westgate is entitled to relief, including but not limited to:

   a.    avoidance of any transfer of goods or funds from HTCW to Expert Stitch;

   b.    attachment of any Westgate Inventory or any HTCW funds in Expert Stitch's or Liston's possession, custody, or control;

   c.    an injunction to prevent further conversion or transfer of the HTCW Goods;

   d.    constructive trust on all proceeds (and payment to Westgate thereof);

   e.    compensatory damages against HTCW and/or Expert Stitch;

   f.    punitive damages; and

   g.    any other relief that may be just and proper under the UFTA.

## COUNT FOUR

### CIVIL CONSPIRACY TO VIOLATE THE UFTA AND/OR TO COMMIT THE TORT OF CONVERSION BY MOULTON, EXPERT STITCH AND COTSWOLD

119.   Paragraphs 1 through 118 of this First Amended Complaint are incorporated by reference into this Count as if fully restated herein.

120.   Moulton, Expert Stitch and Cotswold, acting in concert, conspired to deprive Westgate of its property interests by transferring Westgate Inventory to Expert Stitch (and perhaps others, including Cotswold, as may be discovered during the course of this litigation).

121.   HTCW, Moulton, and Cotswold used Expert Stitch as an alter ego for HTCW to deprive Westgate of its interest.

122.   As a result of their activities, Westgate was damaged in an amount to be determined at trial, and Moulton, Expert Stitch and Cotswold are liable to Westgate for that amount, and Westgate is entitled to a constructive trust on all proceeds.

## COUNT FIVE

### SUCCESSOR LIABILITY AGAINST COTSWOLD, COTSWOLD NON-WOVEN, AND/OR EXPERT STITCH

123.   Paragraphs 1 through 122 of this First Amended Complaint are incorporated by reference into this Count as if fully restated herein.

124.  Cotswold was aware of HTCW's obligation to Westgate.

125.  To take over HTCW's business and to avoid HTCW's obligations to Westgate, Cotswold conspired with Liston, Moulton, Expert Stitch, and/or HTCW to enter into a transaction by which HTCW would stop doing business as it had previously and all of HTCW's business would be transferred to Cotswold and/or Cotswold Non-Woven or Expert Stitch.  Cotswold even hired Liston and Quinones to continue the business so as to maintain key customer relationships and to obtain the use of HTCW's name and customer lists.

126.  Cotswold, Cotswold Non-Woven and Expert Stitch are continuing to operate HTCW's business as prior to March 5, 2009, only now using a different name.

127.  Expert Stitch has sold and continues to sell HTCW goods.  Moreover, upon information and belief, Liston did not maintain corporate form between HTCW and Expert Stitch and treated them as a single entity at times.  Liston clearly transferred tens of thousands of dollars between Expert Stitch and HTCW on a regular basis.  Moreover, instead of paying HTCW to do business, Cotswold paid Expert Stitch.  Expert Stitch is continuing the HTCW business and thus is a successor to HTCW.

31

128.   Cotswold formed Cotswold Non-Woven for the sole purpose of taking over and continuing HTCW's business with the deceptive and willful intent of destroying Westgate's security interest in the HTCW name, goodwill and assets.

129.   In the course of taking over HTCW's business in a manner solely to avoid HTCW's debts, Cotswold and/or Cotswold Non-Woven became the successor to HTCW, operating the business as a "division" of itself.

130.   Cotswold, Cotswold Non-Woven, and/or Expert Stitch have held themselves out as the successor to HTCW to customers and vendors.

131.   Alternatively, Cotswold and/or Cotswold Non-Woven are using Expert Stitch as a means to continue HTCW's business and to deprive Westgate of its security interest.

132.   Accordingly, Cotswold, Cotswold Non-Woven, and/or Expert Stitch should be held liable for all debts and judgments of HTCW as may be entered in this litigation or any other litigation involving these parties.

## COUNT SIX

## TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS AND PROSPECTIVE BUSINESS RELATIONS AGAINST COTSWOLD

133.   Paragraphs 1 through 132 of this First Amended Complaint are incorporated by reference into this Count as if fully restated herein.

32

134.  Cotswold acted improperly and wrongfully, without privilege, in causing HTCW to terminate the Factoring Agreement and preventing Westgate from fully reviewing all the books and records of HTCW before termination.

135.  Cotswold acted improperly and wrongfully, without privilege, in assisting Expert Stitch to convert the HTCW Goods to Expert Stitch's, and perhaps others' benefit and to the detriment of Westgate.  Similarly, Cotswold acted improperly and without privilege in assisting Liston in converting HTCW's assets such as its name and customer lists to Cotswold and/or Cotswold Non-Woven and in violation of the UFTA.  If the goods and assets had not been converted, then Westgate would have been able to exercise its security interest in those goods and assets.

136.  Cotswold acted purposefully, knowingly, and with malice with an intent to injure Westgate to prevent Westgate from receiving the benefits of its bargain with HTCW.

137.  As a result of Cotswold's tortious inference, Westgate has been damaged and is entitled to judgment against Cotswold in an amount to be determined at trial.

## COUNT SEVEN

### PUNITIVE DAMAGES
### AGAINST ALL DEFENDANTS

138.  Paragraphs 1 through 137 of this First Amended Complaint are incorporated by reference into this Count as if fully restated herein.

139.   As set forth above, each of the Defendants independently and knowingly engaged in fraudulent conduct that seriously damaged Westgate.

140.   Each of the Defendants' conduct was willful, malicious, fraudulent, wanton and oppressive.

141.   Pursuant to O.C.G.A. § 51-12-5.1, Westgate is entitled to recover punitive damages against each of the Defendants to deter similar conduct in the future.

142.   Westgate demands judgment against each of the Defendants individually for punitive damages in an amount to be determined at the trial of this case.

**COUNT EIGHT**

**ATTORNEYS' FEES AND COSTS**

143.   Paragraphs 1 through 142 of this First Amended Complaint are herewith incorporated by reference into this Count as if fully set forth herein.

144.   Each Defendant has acted in bad faith, has been stubbornly litigious, or has caused Westgate unnecessary trouble and expense.  Westgate is, therefore, entitled to an award of all costs of this action, including without limitation its attorneys' fees pursuant to O.C.G.A. § 13-6-11.

145.   Westgate demands judgment against Defendants for all costs of this action, including without limitation its attorneys' fees under New Jersey and Georgia law.

WHEREFORE, Westgate demands judgment as follows:

a.      Against HTCW, Cotswold and/or Cotswold Non-Woven for violation of the UFTA, or in the alternative for conversion, for damages in an amount to be determined at trial or for return of HTCW's assets to Westgate, for attachment or other relief as the Court may decide;

b.      Against Moulton, Cotswold and/or Cotswold Non-Woven for conspiracy to violate the UFTA, or in the alternative for conspiracy to commit the tort of conversion, for damages in an amount to be determined at trial;

c.      Against HTCW and Expert Stitch for violation of the UFTA, or in the alternative for conversion, for damages in an amount to be determined at trial or for return of the goods to Westgate, for attachment or other relief as the Court may decide;

d.      Against Moulton, and Cotswold for conspiracy to violate the UFTA, or in the alternative for conspiracy to commit the tort of Conversion, for damages in an amount to be determined at trial;

e.      Against Cotswold, Cotswold Non-Woven, and/or Expert Stitch for any and all judgments against HTCW entered in this lawsuit as the successor to HTCW;

f.     For damages against Cotswold for tortious interference with contract and tortious interference with business and prospective business relations, as determined at trial;

g.     For a constructive trust on all goods, inventory or proceeds from the sale of goods or inventory in which Westgate had a security interest;

h.     For punitive damages against all Defendants in an amount to be determined at trial;

i.     For attorneys' fees and for costs and expenses of litigation against all Defendants individually, jointly and severally, in an amount to be determined before final judgment;

j.     For injunctive relief against Defendants to prevent any further transfer of assets in which Westgate has a perfected security interest;

k.     For trial by jury on all claims; and

l.     For all such other relief that the Court may find or deem just and proper under the facts of this case.

This 24th day of September, 2009.     SEYFARTH SHAW LLP

By _____

Erika C. Birg
Georgia Bar No. 058140
ebirg@seyfarth.com
Clifton B. Welch
Georgia Bar No. 746802
cwelch@seyfarth.com
1545 Peachtree Street, N.E.
Suite 700
Atlanta, GA  30309-2401
Telephone:  (404) 885-1500
Facsimile:  (404) 892-7056

*Attorneys For Plaintiff Westgate
Financial Corporation*

ATI 32584259.3